## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRATERNAL ORDER OF POLICE,
DC LODGE #1, et al.

        Plaintiffs,

vs.

EDWARD BARRY, et al,

        Defendants.

Civil No. 08-462 (ESH)

## DEFENDANTS/COUNTERCLAIMANTS' MOTION FOR
## PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65(a) and Local Civil Rule 65.1,

Defendants/Counterclaimants respectfully move this Court to enter a

preliminary injunction ordering the Plaintiffs/Counterdefendants to renounce

and dissolve the trusteeship and to take all other such actions as may be

necessary to return full operation and control of the Postal Police Officers

Association to the leadership of that union as prior to the trusteeship.[1]

---

[1] On May 27, Mr. Barry moved the Court to permit him to amend his answer
and thereby to join in the Answer and Counterclaim filed by his fellow
Defendants (Doc. 19). The Court has not yet issued a decision on that motion,
and thus Mr. Barry joins in this preliminary-injunction request only on a
conditional basis.

In support of this request, Defendants/Counterclaimants rely on the accompanying Brief in Support; the Declarations of Edward Barry, Daniel Dunlap, Julian Diaz, Paul Ferraro, Christopher Vitolo and Mark Wilson; and the exhibits attached to them.  A Proposed Order has also been filed.

Dated:  June 16, 2008         Respectfully submitted,


s/ Arlus J. Stephens
Arlus J. Stephens (478938)
Keira M. McNett (482199)
Davis, Cowell & Bowe LLP
1701 K Street NW, Suite 210
Washington, DC 20006
(202) 223-2620
(Fax) (202) 223-8651

Attorneys for Defendants/Counterclaimants

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRATERNAL ORDER OF POLICE,
DC LODGE #1, et al.

       Plaintiffs,

vs.

EDWARD BARRY, et al,

       Defendants.

Civil No. 08-462 (ESH)

## COUNTERCLAIMANTS' MEMORANDUM IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

Counterclaimants have respectfully moved this Court to issue a preliminary injunction ordering the Plaintiffs/Counterdefendants to rescind the trusteeship and take all other acts necessary to return control of the Postal Police Officers Association ("PPOA") to its own officers.

As set forth below, the trusteeship is unlawful for each of the following reasons: *first*, it was imposed in violation of the Charter Agreement between the PPOA and FOP DC Lodge #1 (DC 1); *second*, nothing in DC 1's Constitution or Bylaws authorizes a trusteeship, let alone describes under what circumstances a trusteeship would be proper; *third*, the trusteeship was imposed without a prior hearing; *fourth*, a hearing alleged to be held a month

later failed to meet any kind of due process protections and would have been futile in any event since the DC 1 decision makers had already publicly accused the PPOA's officers of illegal conduct; and *fifth*, the trusteeship was imposed for an improper purpose, namely to restore to power the former president and put her in a preferred political position vis-à-vis other officers.

A preliminary injunction is appropriate because (1) the Counterclaimants are likely to succeed on the merits of their legal claim; (2) without injunctive relief, they, the PPOA and its membership will continue to suffer irreparable harm by the illegitimate trusteeship; (3) injunctive relief will not substantially harm DC 1 or others interested parties; and (4) the public interest favors injunctive relief in favor of the Counterclaimants' position.

## STATEMENT OF FACTS

### A. The Postal Police Officers Association and its initial relationship with the FOP's National Labor Council

In the early 1990s, the NLRB certified the Postal Police Officers Association as the bargaining representative for a nationwide unit of police officers working for the U.S. Postal Service (Declaration of Mark Wilson, ¶2). The PPOA affiliated with the Fraternal Order of Police, allowing it to use the "FOP" trademark (*Id.* ¶¶2-3).

The National FOP traditionally arranged the various bargaining-unit representatives by geography, but in the early 1990's it created a new entity called the National Labor Council ("NLC") (Wilson Decl. ¶2). The PPOA affiliated with the NLC, and adopted the alternate name Fraternal Order of Police, National Labor Council #2, USPS (FOP NLC #2) (*Id.*, ¶1).

In a published decision issued in 2002, regarding another FOP NLC-affiliated union, the National Mediation Board found the following facts about NLC and its affiliated unions:

"Created in 1989 by the FOP, the FOP NLC was to be an independent, umbrella council of local labor organizations representing police officers with multijurisdiction and national police powers using the FOP trademark. Also in 1989, the FOP, NLC became a not-for-profit DC corporation. The first local labor organization created under the FOP NLC was Conrail 1, under a Board certification. Later, the local USPS 2 was added to the FOP NLC under an NLRB certification. In 1996, the local BEP 3 was added to the FOP NLC under an FLRA certification. By the mid-90's, the FOP NLC was nothing more than a shell. As a corporation, the FOP NLC, Inc. was revoked by the DC Government in 1998. The FOP dissolved the FOP NLC in August 2001. The three locals formed under the FOP NLC became independent labor

organizations which merely use the FOP trademark."

*In re Conrail Corp.*, 29 NMB 265, 273-74 (2002) (a copy is attached).

As stated, upon the dissolution of the FOP NLC, the PPOA became an independent union. *Id.*; Wilson Decl. ¶4. The PPOA wished to continue using the FOP trademark, and that led the PPOA to affiliate with a regional FOP body, FOP Lodge #1 based in Washington ("DC 1") (Wilson Decl. ¶4).

### B.    The PPOA's contractual relationship with DC 1

The PPOA's affiliation with DC 1 is governed by terms set forth in a Charter Agreement negotiated in 2001 (Wilson Decl. ¶¶3-5 and Exh. A). According to the Charter Agreement, only the DC 1 Constitution may supersede it (Wilson Decl. Exh. A at ¶2).

The Charter states that the PPOA would become a "labor committee" as defined in DC 1's Constitution (*Id.*, Charter, ¶2).

The Charter states that the operation of the PPOA is to be governed by the Charter and "implementing by-laws, rules, regulations, the FOP-NLC #2 Constitution, or procedures adopted by the Labor Committee." (Wilson Decl., Exh. A at ¶2). DC 1's Constitution, at Article 22, Section 4, sets forth the parameters within which labor committees may adopt such bylaws, rules, regulations and procedures (Dunlap Decl. ¶8, Exh. B at 14-15). The PPOA did not adopt such implementing rules or regulations (Wilson Decl. ¶5).

4

If "matters pertaining to the operation" of the PPOA are not set forth in the Charter or PPOA's own governing instruments, the Charter provides that "applicable provisions of the Lodge Constitution and by-laws or applicable federal law shall control." (Wilson Decl., Exh. A at ¶2).

Paragraph 4 of the Charter sets forth DC 1's oversight authority over the PPOA. It provides that the PPOA must maintain fiscal integrity in its affairs, provide for accounting controls and issue regular financial reports to its members. (*Id.,* Exh. A at ¶4). It further provides that DC 1 may examine and audit its financial or other records "as may be required to insure that the Labor Committee is meeting its obligations under the law." (*Id.*)

Nothing in the Charter provides authority for any kind of a trusteeship, let alone any description of the procedures or circumstances under which a trusteeship could be possible.

Moreover, nothing in DC 1's Constitution provides authority for any kind of a trusteeship, let alone any description of the procedures or circumstances under which a trusteeship could be possible. Its Bylaws are equally silent on trusteeship authority.

During the negotiations over the Charter Agreement, the parties discussed the issue of oversight by DC 1 into the PPOA's affairs and the language in the Charter was designed to address that issue (Wilson Decl. ¶6).

5

In the event either party became unhappy with the arrangement, each was free to dissolve the Charter Agreement and go its own way (*Id.* ¶7).

### C. The PPOA's own governing documents and structure

As the Charter makes clear, the PPOA is bound first and foremost by its own internal governing documents. (Dunlap Decl., Exh. A at ¶2).

The PPOA's Constitution provides for three top elected offices: President, First Vice President and Second Vice President. It also provides for an Executive Board comprised of other top officials (PPOA Constitution, Dunlap Decl. ¶9, Exh. C). These positions are part-time, as those involved maintain full-time jobs with the Postal Service (*E.g.,* Vitolo Decl. ¶¶1-3; Diaz Decl. ¶¶1-3).

The PPOA has two individuals who serve as representatives on the DC 1 Board of Directors: the President and the Trustee (DC 1 Constitution, Dunlap Decl., Exh. B).

Disputes over adherence to the rules of the PPOA are resolved by means of an internal disciplinary system, which is itself governed by the PPOA's Constitution (Dunlap Decl., Exh. C at Article 7). To deter abuse of this system and prevent its use for political ends, the PPOA's Constitution mandates sanctions to be imposed against an officer who files malicious or frivolous charges against another officer (*Id.*, Art. 7, Sec. XIV).

6

**D.    A political rift develops between two top officers, leading one to file an internal charge against the other and a trial is held in January 2008.**

In 2005, Ed Barry was elected PPOA First Vice President and Teri Grant was elected Second Vice President (Barry Decl. ¶¶3-4). In 2006, the president retired, meaning the other two moved up one position. In December 2006, Barry stepped down from the presidency for lack of time, making Teri Grant the PPOA President. Months later, Grant asked Barry if he would consider returning to the Board as Second Vice President, and he agreed to do so as a favor to her (*Id.*).

Thus, as of 2007, the PPOA President was Teri Grant, the First Vice President was Tom Colangelo, the Second Vice President was Ed Barry, and the Secretary-Treasurer was Paul Ferraro (Barry Decl. ¶3). Midway through the year, Grant asked Chris Vitolo, from Cleveland, to fill a vacancy as Grievance Secretary; he agreed and was confirmed to that position (Vitolo Decl.  ¶4). Other members of the executive board included the PPOA's area representatives, among them Julian Diaz representing the northeast and Dan Dunlap representing the east (Diaz Decl. ¶2; Dunlap Decl. ¶3).

In or about May 2007, the PPOA and the Postal Service reached an impasse in negotiations for a new bargaining agreement. (Ferraro Decl., ¶3)

7

In the latter part of 2007, President Grant and Treasurer Ferraro were at odds, and Grant filed an internal union charge against Ferraro alleging he improperly sought reimbursement of expenses from the PPOA (Ferraro Decl., ¶4). Such a charge is governed by Article 7 of the PPOA's Constitution.

Ferraro sought dismissal of the charge because he claimed it lacked support, but his request was denied by Grant, Colangelo and Barry (Ferraro Decl., ¶5, Exh. A). In an email announcing the denial, Colangelo (a Grant ally) stated that "Paul can go to D.C. 1 if he wishes, but they're the ones that told us to get rid of him." (*Id.*; Vitolo Decl. ¶6).

Then-First Vice President Colangelo set the trial date for January 4 in Washington (Vitolo, Decl. ¶6). Ferraro objected to this date and place but Colangelo overruled his objection and stated that the trial against him would proceed with or without him (Ferraro Decl. ¶6, Exh. B).

Colangelo resigned as First Vice President in late December and shortly thereafter, and just days before the trial date, Grant asked the PPOA executive board to postpone the trial date. Arrangements for travel and leave already having been made, the request was denied (Vitolo Decl. ¶6). Grant responded by issuing a purported unilateral decree canceling the trial, but this was also rejected (Barry Decl. ¶5).

8

On January 4, 2008, the trial was held as scheduled. Grant did not appear (Diaz Decl. ¶6; Vitolo Decl. ¶9). Ferraro testified and submitted evidence supporting his innocence (Diaz Decl. ¶5; Vitolo Decl. ¶8). The trial board voted unanimously that Ferraro was not guilty of any misconduct (Diaz Decl. ¶7; Barry Decl. ¶6; Dunlap Decl. ¶4; Vitolo Decl. ¶10).

The PPOA Constitution calls for sanctions against officers who file baseless internal union charges against other officers (PPOA Constitution, Dunlap Decl. Exh. C at Art. 7, Sec. XIV). The trial board concluded, based on its reading of the PPOA Constitution, that Grant should be sanctioned for pursuing the charge against Ferraro, and that an appropriate sanction was removal from office, but not loss of membership rights (Diaz Decl. ¶¶8-9; Dunlap Decl. ¶4; Vitolo Decl. ¶¶11-13; Barry Decl. ¶¶7-8). Grant did not appeal the trial board's decision in accordance with the PPOA Constitution, which provides an appeal to all executive board members and regional representatives, who may by majority vote overturn a decision (Dunlap Decl. ¶5 and Exh. C at Art. 7, Section XVI).

### E.    DC 1 representatives tried to intervene on Grant's behalf before and after the trial on her charge against Ferraro.

Shortly before the trial date, Grant hired attorney DeNigris with PPOA funds to act as her personal attorney (Ferraro Decl. ¶¶7-8). DeNigris sent

letters to Ferraro warning him not to interfere with the payment of funds to
him and not to challenge her authority (Ferraro Decl., ¶¶7-8 and Exhs. C-D).

Following her removal from office (and from authority to access funds),
Grant was able to withdraw $50,000 from the PPOA's bank account and
continued making payments to her lawyer (Ferraro Decl. ¶15-16).

On January 31, DC 1 President Muzzatti called Barry and Ferraro.
Muzzatti explained that he was concerned about the sanction imposed on
Grant (Barry Decl. ¶10; Ferraro Decl. ¶9). Muzzatti told them he had a
meeting with the DC 1 board of directors and said he would call back at the
end of the day (Barry Decl. ¶10). He did not call back (*Id.*). Barry and
Dunlap, who were the PPOA's representatives on the DC 1 board of directors,
had not been notified of any such meeting (Barry Decl. ¶12; Dunlap Decl. ¶6).

**F.    On February 1, DC 1 announced a trusteeship of the
       PPOA, but did so without any authority, without any
       hearing and without proper notice to the membership.**

By letter dated February 1, 2008, DC 1 asserted a trusteeship over the
PPOA. It issued two documents. The first, titled Order for Trusteeship,
stated that the DC 1 Board of Directors voted on January 31 to trustee the
PPOA, "pursuant to its Constitution and Bylaws" (Dunlap Decl., Exh. D). It
announced that the Trustee was DC 1's general counsel, Steven Anthony (*Id.*)

The second document was a letter written by DC 1 President Muzzatti and addressed to the PPOA's members (Dunlap Decl., Exh. E). The letter recites that DC 1's Board of Directors authorized the trusteeship at a January 31 meeting and that "[t]his decision was prompted by the ongoing controversy among members of the Executive Board that resulted in the unlawful removal of Teri Grant from the office of President." (*Id.*).

The letter then addresses "Mr. Barry and other Board Members who conspired in the unlawful removal of Ms. Grant from the office of President":

"The conduct of Mr. Barry and those who supported him in this misadventure violates due process of law protections for our respective constitutions, embarrasses the membership with management and recklessly exposes NLC2 to charges of union corruption and sexual and racial discrimination.

Trusteeship also compels DC1 to investigate allegations that Mr. Ferraro and Mr. Dunlap have taken thousands of dollars of union funds and failed or refused to provide adequate documentation that these withdrawals were expended for union purposes. The Department of Labor considers misappropriation of union funds a criminal offense and DC1 plans to conduct a thorough investigation of these allegations."

(Muzzatti letter, Dunlap Decl. Exh. E).

11

The letter does not reference any hearing regarding whether a trusteeship was appropriate, because none was held and none was scheduled (*Id.*). Instead, it shifted the burdens of persuasion and initiation, stating that "[a]ny Petition for Termination of the Trusteeship shall be directed to Mr. Anthony . . ." (*Id.*).

The letter and the order were addressed to PPOA's members, but only reached about a quarter of them (Dunlap Decl. ¶11). This is because only a quarter of the members had signed up on the email list-serv used to send the documents (*Id.*). The PPOA had always used the Postal Service to communicate important information to its members (*Id.* ¶13). Notice of the documents was sent to the PPOA's executive board members by Teri Grant from her personal email account (*Id.* ¶12).

### G.    Post-trusteeship events; Grant is reinstated to run the Union and the other officers are removed and condemned

Following the asserted trusteeship, the PPOA's bank accounts were frozen because of competing claims of ownership (Ferraro Decl. ¶16).

Attorney Anthony, the designated trustee, called Ferraro and told him that DC 1 had revoked the Charter Agreement with the PPOA, but then later stated it was not yet dissolved but could be (Ferraro Decl. ¶11 and Exh. E).

In an email to Barry, Anthony stated that he would be charging the legal costs of the trusteeship effort to the PPOA's own bank account (Ferraro Decl. Exh. E).

At a meeting of the DC 1 Board of Directors in February 2008, which Dunlap observed, a DC 1 official asked for authority to impose trusteeships over affiliated labor committees (Dunlap Decl. ¶14). Another officer, however, moved that the request be postponed and that request was approved (*Id.*).

By letter dated February 20, Muzzatti wrote a letter to Barry (Barry Decl., Exh D). Muzzatti wrote that "[y]our unlawful discharge of the President of NLC2 prompted this trusteeship." (*Id.*).

Muzzatti's letter also informed Barry that he and Ferraro were required to attend a hearing in Washington on February 29 (*Id.*). They were instructed to bring records which they had been unwilling to produce because they believed the trusteeship to be unlawful (*Id.*). When Barry and Ferraro sought to clarify whether they would be reimbursed for their lost day of pay and travel expenses, Grant – acting at the behest of the trustee -- sent them an email telling them they would get no reimbursement (Barry Decl. ¶15). On the very eve of the hearing, however, Muzzatti changed his mind but by that point it was too late to get leave from work (Barry Decl. ¶16).

13

Anthony sent a letter to the PPOA's members in March 2008 which stated several things, including the following: *first*, he accused Barry and Ferraro of subverting the negotiations with the USPS and of forcing huge legal costs on the Union; *second*, he announced that he had appointed some new representatives but kept others in place; *third*, he announced the formation of a Management Committee to advise him on running the Union; *fourth*, he announced that Teri Grant would be Chair of both the Management Committee and the Negotiating Committee; and *fifth*, he announced the strategic course he wished to pursue regarding the efforts for a new agreement with the USPS, noting that there were differences of opinion. (Ferraro Decl., Exh. F).

Anthony removed from office only those elected representatives who were present on the trial board. Other, similarly situated representatives who did not come to Washington for the January trial board were not removed (Diaz Decl. ¶¶4, 11).

Regarding negotiations, Anthony removed Dunlap and others from their positions on the negotiating committee (Dunlap Decl. ¶20).

Since then, the Union paid for a letter, signed by Grant, to be sent to members announcing the new contract ordered by a panel of arbitrators (Dunlap Decl. Exh. G). The letter recited that those who were opposed to her

14

leadership in negotiations "used illegal means to remove me as President," and explained why the course that she had recommended was the much better course of action (*Id.*).

The Postal Service has also clarified that it will no longer deal with the PPOA's chosen officials but will instead deal with Trustee Anthony on all labor-relations matters (Ferraro Decl. Exh. G).

## JURISDICTION AND VENUE

This Court has jurisdiction pursuant to LMRDA § 304, 29 U.S.C. § 464. Judicial review is available "for such relief (including injunctions) as may be appropriate." 29 U.S.C. § 464(a). Venue is proper because DC 1's principal office is located in this district. 29 U.S.C. § 464(b).

## STANDARD OF REVIEW

The Court may grant a preliminary injunction where the party seeking the injunction shows: (1) a strong likelihood of success on the merits; (2) that without injunctive relief it will suffer irreparable harm; (3) that injunctive relief will not substantially harm other interested parties; and (4) that the public interest favors the injunction. *Johnson v. Holway*, 329 F.Supp.2d 12, 15 (D.D.C. 2004).

Although trusteeships may enjoy a presumption of validity, *id.* at 15-16, this presumption of validity applies only when the trusteeship was

15

established "in conformity with the procedural requirements of [the parent body's] constitution and bylaws and authorized or ratified after a fair hearing." LMRDA § 304(c), 29 U.S.C. § 464(c).

Because DC 1 did not have authority to impose the purported trusteeship and because it was imposed without a hearing, it loses "*ex post*, the advantage of the presumption embodied in section 304(c)" and DC 1 "may be disqualified from imposing a trusteeship altogether." *Laborers' Int'l Union v. National Post Office Mail Handlers*, 880 F.2d 1388, 1396 (D.C. Cir. 1989).

## ARGUMENT

The Counterclaimants seek injunctive relief on the grounds that (1) they are likely to succeed on the merits; (2) without injunctive relief, they and the PPOA will suffer irreparable harm; (3) injunctive relief will not substantially harm other interested parties; and (4) the public interest favors injunctive relief for the Counterclaimants.

## I.    COUNTERCLAIMANTS ARE LIKELY TO SUCCEED ON THE MERITS.

The facts support a finding that the Counterclaimants are likely to succeed on the merits.

First, we argue that the purported trusteeship was procedurally unlawful and thus void. Because the purported trusteeship was not

authorized by the documents governing the parties' relationship and in any case failed to meet minimum procedural standards, it was wholly invalid. Second, if the Court determines that there were no procedural impediments to the trusteeship, we ask the Court to hold that the trusteeship was nonetheless unlawful because it was imposed in bad faith.

## A.    The Trusteeship was Invalid *Ab Initio*.

We submit the purported trusteeship is and has been unlawful because it failed to meet numerous procedural minimums.  As such, no presumption of validity applies.  *Laborers*, 880 F.2d at 1396. To the contrary, because it does not meet the bare minimums mandated by the LMRDA, the trusteeship is unlawful and should be rescinded.  *Id.*

### 1.    The trusteeship is invalid because the Charter Agreement between DC 1 and the PPOA does not include trusteeship powers.

The relationship between DC 1 and the PPOA is governed first and foremost by the Charter Agreement, which provides: "To the extent that matters pertaining to the operation of the Labor Committee are not set forth in this Charter or implementing by-laws, rules, regulations, the FOP-NLC #2 Constitution, or procedures adopted by the Labor Committee, applicable provisions of the Lodge Constitution and by-laws or applicable federal law shall control."  (Dunlap Decl. Exh. A, ¶2).

17

The Charter Agreement does in fact contain a provision providing for the scope of DC 1's oversight over PPOA.  Section 4 of the agreement specifies that DC 1 has the power to audit the PPOA's financial records and other records to "insure that the Labor Committee is meeting its obligations under the law." (*Id.*, ¶4).

As the Charter specifies, where it addresses a particular issue – here, DC 1's oversight authority – it is the sole source of authority on this issue unless it conflicts with DC 1's constitution.  Because the Charter Agreement sets forth the scope of DC 1's oversight powers, and DC 1's constitution is silent and thus does not conflict, there is no need to look at any other document.  Reference to the DC 1 constitution or bylaws is necessary only to the extent that a matter "is <u>not</u> set forth" in the Charter or PPOA's own governing documents. (Chater Agreement, Dunlap Decl., Exh. A, ¶2).

The Charter's oversight clause does not provide DC 1 with the authority to trustee the PPOA, and merely provides authority to audit financial and other records of the PPOA to insure compliance with the law (Charter, ¶4). This was the intent of the parties when they negotiated the Charter Agreement (Wilson Decl. ¶6).

Because the PPOA was an independent labor organization, and sought to affiliate with DC 1 in order to maintain the FOP trademark, no more

18

oversight than that would be proper.  If either side was unhappy, they each had the right to dissolve the Charter Agreement (Wilson Decl. ¶7).

> **2.    The trusteeship is invalid because DC 1's constitution and bylaws do not provide it with authority for imposing trusteeship.**

Even if the Charter Agreement did not preclude it, DC 1 does not have any legal power to impose a trusteeship, as the only possible sources of such authority would have to be in its Constitution and Bylaws. *United Bhd. of Carpenters v. Brown*, 343 F.2d 872, 881-82 (10th Cir. 1965); *Flight Engineers Int'l Assoc. v. Continental Airlines*, 297 F.2d 397, 402 (9th Cir. 1961).

DC 1's Constitution and Bylaws do not provide it with any such authority to trustee a chartered body.

Constitutional or bylaw authority for a trusteeship is required by the express language of Section 302 of the Act, which provides that a trusteeship may be established and administered "<u>only</u> in accordance with the constitution and bylaws of the organization which has assumed trusteeship." LMRDA § 302; 29 U.S.C. §462 (emphasis added).

"Whatever 'inherent' power an international union <u>formerly</u> may have had to impose a trusteeship where the international constitution or by-laws made no provision therefore, it has had no such power since the enactment [of the LMRDA]." *Flight Engineers*, 297 F.2d at 402 (emphasis added).

19

The legislative history of Section 302 shows the Congress was intent on limiting the right of unions to trustee subordinate bodies. *Id.* This further supports a plain-language reading of the statute, requiring that the governing constitution or bylaws must expressly provide authority to impose a trusteeship. *Id.*

The DC 1 Constitution and Bylaws provide no authority to trustee the PPOA. "Obviously, a trusteeship cannot conform to the constitution and bylaws of a labor organization where, as here, the constitution and bylaws make no provision for trusteeship." *United Bhd of Carpenters v. Brown*, 343 F.2d at 882.

In *Brown*, the United Brotherhood of Carpenters argued that authority to impose a trusteeship could be inferred from language in its constitution empowering it to "take such action as is necessary and proper for the welfare" of the national body. *Id.* The Tenth Circuit rejected this argument: "We think the statute not only contemplates, but requires, more than some vague general reference to the effect that the parent organization shall have power to take such action as is necessary and proper for its welfare." *Id.*

DC 1's Constitution and Bylaws do not even contain such a vague reference from which trusteeship authority could arguably be inferred. An entire article of the DC 1 Constitution is devoted to the subject of subordinate

20

labor committees, with nary a mention of anything approaching the right to trustee and take over the power, property and affairs of them (Article 22 of the DC 1 Constitution, Dunlap Decl., Exh. B).

DC 1 may argue that a document called "Standing Rules" permits it to trustee the PPOA, but this is not a legitimate source of trusteeship authority. Federal law provides that trusteeship may be established and administered "only in accordance with the constitution and bylaws of the organization which has assumed trusteeship" --- LMRDA §302; 29 U.S.C. §462 (emphasis added) --- and not some other miscellaneous documents or rules.

In addition, the Charter Agreement specifies that only the DC 1 constitution may supersede the Charter Agreement: "In the event of a conflict between the Charter and the Lodge Constitution, the provisions of the Lodge Constitution shall control, unless such a result will be contrary to applicable law." (Charter Agreement, ¶2). And the DC 1 Bylaws may not even be considered unless the Charter and all of the PPOA's own documents are silent on a particular subject matter.

Finally, it appears these "Standing Rules" may be of very recent vintage. At a DC 1 Board of Directors meeting earlier this year, a request was made to provide DC 1 with trusteeship authority, with the PPOA situation referenced as the source of concern, but the request was postponed

21

(Dunlap Decl., ¶14).

Regardless, to amend the Constitution or Bylaws requires a series of procedural hurdles, and these have not been taken (Dunlap Decl. ¶¶15-16 and Exh. B). Moreover, such a proposed major change to the terms of the relationship between DC 1 and its affiliated labor committees would warrant the PPOA to decide whether to continue the affiliation.

Thus, because DC 1's Constitution and Bylaws do not grant it authority to trustee subordinate bodies, the trusteeship has been invalid from its inception. *United Bhd of Carpenters v. Brown*, 343 F.2d at 884.

Because there is no authority to impose a trusteeship generally, there are therefore, a fortiori, no <u>procedures</u> explaining how and under what circumstances a trusteeship is appropriate. The D.C. Circuit has not decided whether such procedures are required, *Local Union 13410, United Mine Workers v. United Mine Workers*, 475 F.2d 906, 910 n.5 (D.C. Cir. 1973), but most courts hold that such procedures must be set forth. A leading treatise states that "[t]he better view is that the constitution must specify the purposes and procedures for authorized trusteeships," Martin H. Malin, *Individual Rights Within the Union*, 180 (1988), explaining as follows:

> This is in keeping with the plain language of the statute which mandates that the trusteeship be established "only in accordance with the constitution and bylaws." If the constitution fails to

22

specify the purposes and procedures, it is impossible to establish the trusteeship in accordance with the constitution.

Moreover, requiring that the constitution specify purposes and procedures is consistent with the congressional intent to "encourage the use of fair procedure within the union." A contrary interpretation would require unions adopting such provisions in their constitutions to be bound by them while allowing unions whose constitutions merely provided vague authority for imposing trusteeships greater freedom in exercising that authority. The message to unions would be clear: Avoid the fairness and regularity that results from having specific standards in your constitution.

*Id.* at 180-81 (internal citations omitted). *See also Brown*, 343 F.2d at 882 (Section 302 "requires at the very least that the organization's constitution and bylaws set forth the circumstances under which a trusteeship may be established over its local unions and the manner or procedure in which it is to be imposed.").

Even if some authority for a trusteeship could be inferred from penumbras, formed by emanations from something in DC 1's Constitution or Bylaws, neither document specifies the grounds or procedures for imposing such a trusteeship. DC 1's imposition of trusteeship here is thus invalid as contrary to the plain language and the purpose of the statute. *Id.*; Malin, *supra* at 180-81 (a copy is attached hereto as Exh. B).

23

###   3.    The trusteeship is invalid because it was imposed without a prior hearing.

A parent body must hold a hearing prior to trusteeing a subordinate body.  In explaining the requirement of a hearing prior to imposing trusteeship, the D.C. Circuit referred to the legislative history, noting that prior to the passage of the Act, the common law required a hearing for a trusteeship to be valid.  *Local Union 13410, UMWA*, 475 F.2d at 913-14 (citing *Jolly v. Gorman*, 428 F.2d 960 (5th Cir. 1970)). Congress intended to provide at least this level of process provided at common law, as the very purpose of the statute's trusteeship provisions was to "prevent abuses of union trusteeships and to require disclosure of the reasons for union actions in matters touching the governance of local union affairs." *Id.* at 914.  The court cited further policy considerations: "In general, it is wise to encourage consultation and negotiation before permitting the use of so drastic a measure as trusteeship." *Id.* at 914.

Given the legislative history and these policy considerations, the D.C. Circuit held that absent an "extreme emergency," a hearing should be held prior to trusteeship, and even in the case of such an emergency, "a hearing date should be set when the trusteeship [is] imposed and held shortly thereafter." *Id.* at 914-15.

24

The trusteeship here was imposed on a non-emergency basis and without a prior hearing.  In its Complaint, DC 1 does not allege that the trusteeship was imposed because of emergency circumstances.  Nor does it even plead any facts from which an emergency could be inferred.  And even if the purported trusteeship was imposed on an emergency basis, DC 1 should have scheduled a hearing at the time when it imposed the trusteeship.  *Id.*  It did not do this.

Because the trusteeship here did not comply with the fundamental hearing requirement, it is void *ab initio*.  *Local Union 13410, UMWA*, 475 F.2d at 914.

> **4.    Even if the failure to hold a hearing could have been remedied, the proposed post-trusteeship hearing failed basic due process requirements and would have been futile.**

Even DC 1 could somehow retroactively claim and establish that an extreme emergency existed to postpone a hearing until after trusteeing, DC 1's reliance on a proposed later hearing is insufficient because it fails due process minimums and would have been futile regardless.

First, a post-trusteeship hearing is appropriate only in the event of a real emergency.  The classic example of an emergency justifying a "quickie" trusteeship is where the chief officers are getting ready to flee the country

with the local union's treasury. No such facts exist here and thus a post-trusteeship hearing was not allowable.

Moreover, the proposed post-trusteeship hearing fails any number of due process protections. "[A] fair hearing implies at least the procedural requirements of notice of the charges and the date and nature of the hearing..." *Jolly v. Gorman*, 428 F.2d at 967-68 (meeting failed to satisfy the basic requirements for a fair hearing and thus was not sufficient for valid imposition of trusteeship).

DC 1 alleges that a hearing on the trusteeship was to be held on February 29 as a follow up to protests by PPOA officers. Notice of this February 29 hearing was sent to Ed Barry, the president, but to no others. Even if notice were sent on the limited-access list-serv, that would reach only about a quarter of the members. (Dunlap Decl. ¶13)

Although the D.C. Circuit has not articulated specific requirements for the contents of a notification of trusteeship hearing, other jurisdictions require written notice of the "factual basis for alleged violation of law or the union's constitution that justify imposition of a trusteeship." *Becker v. Industrial Union of Marine Workers*, 900 F.2d 761, 768 (4th Cir. 1990). The notice should also "indicate that the local will have the opportunity to respond to the charges." *Id.*

26

The trusteeship order sent on February 1 did not notify members of a hearing and, since there was no hearing, did not notify members of their right to participate at such a hearing. *Cf. Becker*, 900 F.2d 768.  More importantly, because it was only disseminated to a narrow audience of PPOA members with access to the website, it was not calculated to and did not in fact reach most of the membership, leaving them wholly without notice. Then, when a hearing was later scheduled, notice was provided only to the deposed former President, who now lacked access to funds to prepare a case. He and the other executive board members were given conflicting information about whether they would be reimbursed for leaving their full time jobs in other parts of the country in order to appear at a DC 1 hearing, presided over by an individual who already written that they were guilty of illegal conduct.

DC 1's failure to hold a fair hearing invalidates the trusteeship. *Laborers'*, 880 F.2d at 1396 ("[U]nions that fail to hold fair hearings will lose, *ex post*, the advantage of the presumption embodied in section 304(c) and may be disqualified from imposing a trusteeship altogether.").

### B.    Regardless of the Procedural Deficiencies, the Trusteeship was Imposed for an Improper Purpose.

Even if DC 1 had authority and had actually followed the necessary procedures for imposing trusteeship – which it did not – the trusteeship is

still invalid because it was imposed for an improper purpose.

If a parent body has authority to trustee a subordinate and it holds a valid hearing, a presumption of validity will apply unless the subordinate can demonstrate "clear and convincing proof that the trusteeship was not established or maintained in good faith for a purpose allowable under section 462 of this title." LMRDA § 304(c), 29 U.S.C. § 464(c).

While the LMRDA sets forth several permissible reasons for a trusteeship, 29 U.S.C. §462, the circumstances here are not included. DC 1 officials reiterated several times that the reason for the trusteeship was the sanction imposed on Grant for filing the malicious internal union charge against her rival Ferraro. Moreover, they acted in conformance with that sentiment by restoring Grant to power, giving her a platform to communicate with the membership, and condemning and removing the trial board members who voted to sanction her. (*See* Statement of Facts, Section G).

But the trial board members acted appropriately and in conformity with the PPOA Constitution which mandated such a sanction (*See* PPOA Constitution, Art. 7, Section XIV). The law allows unions to take steps to prevent abuse of their internal charge systems. *Steelworkers Local 9292 (Allied Signal Technical Services)*, 336 NLRB 52 (2001) (holding that union properly suspended membership status of individual found to have abused its

28

internal charge system by filing frivolous charges against union officer).

Further, by asserting in the letter to members other pretextual bases for trusteeship, DC 1 engaged in bad faith that by itself undercuts the trusteeship. *Local Union 13410*, 475 F.2d at 913 ("Most obviously, the imposition of the trusteeship would be invalid if at the time of imposition there was no rational basis for the International's belief that democratic procedures were in jeopardy. Under the circumstances as they appear at the time, the International's assertion that democratic procedures in the Local were endangered appears more as an afterthought justifying abrupt and arbitrary action taken."); *Teamsters Local Union 406 v. Crane*, 848 F.2d 709, 714-15 (6th Cir. 1988) (suggesting direct evidence of pretext would be sufficient to establish bad faith).

In sum, DC 1 interfered with the PPOA's own internal affairs to restore to power an individual who was removed from office in accordance with the PPOA Constitution, thereby allowing her to bypass the avenue for appeal set forth in the Constitution, and then punishing those officers who participated in the trial. This is an impermissible use of a trusteeship under the LMRDA.

Moreover, as explained in detail above, DC 1 purported to establish a trusteeship despite the fact that it had no contractual authority to do so and did not hold a hearing. Such disregard for basic procedural requirements

29

alone constitutes bad faith.  Malin, *supra* at 204 ("deliberate procedural error

in establishing the trusteeship should also be regarded as establishing the

requisite bad faith").

Because DC 1's real purpose for imposing trusteeship is not a

permissible purpose under the LMRDA and its proffered "legitimate" purpose

is pretextual, as shown by direct evidence, the trusteeship is invalid, and

therefore is void *ab initio. Allied Indus. Workers v. Local Union 589*, 693

F.2d 666, 674 (7th Cir. 1982).

## II. WITHOUT INJUNCTIVE RELIEF, THE PPOA AND THE COUNTERCLAIMANTS WILL BE IRREPERABLY HARMED.

Counterclaimants have suffered and continue to suffer irreparable

harm as a result of DC 1's purported trusteeship and removal of them from

their positions as the democratically elected leadership of the PPOA.  The

entire PPOA membership is likewise subjected to irreparable harm because

DC 1's imposition of the illegitimate trusteeship has left the PPOA without

proper leadership and unable to function.

The Counterclaimants are the democratically elected officers of the

PPOA.  By purporting to trustee the PPOA and thereby removing

Counterclaimants from their leadership positions, DC 1 has infringed on the

PPOA's right to self-determination.  *Local 450, IUE v. International Union of*

30

*Elec. Workers*, 30 F.Supp.2d 574, 586 (E.D.N.Y. 1998) (granting preliminary injunction where local and its officers suffered irreparable harm in being denied the right to decide local union matters and control local union assets); *Regan v. Williams*, 1986 WL 8413 (W.D.Pa. 1986) (trusteeship must be dissolved to avoid irreparable harm to members denied their "right to be represented by their elected leaders").

The implementation of an illegitimate trusteeship can cripple a local union, as the Seventh Circuit recognized in the *Allied Industrial Workers* case. "The establishment and operation of the trusteeship in this case has created an untenable situation for all the parties." *Allied Indus. Workers*, 693 F.2d at 674. "[T]he local union's bank account remains frozen" and "[t]he affairs of the local union are in disarray at a time when the local union and the employer are about to begin a new round of collective bargaining." *Id.* The court determined that the international imposed the trusteeship in bad faith, and it ordered the trusteeship dissolved. *Id.* at 675-76.

The facts here parallel those relied on by the Seventh Circuit in *Allied Industrial Workers*. The PPOA's bank accounts have been frozen, negotiation strategy has changed and other union business is not being addressed.

Injunctive relief is necessary so that the PPOA can resume operating and servicing its members. The continuation of the status quo will inflict

31

irreparable harm on the PPOA because it will not be able to continue to operate without funds and without the leadership of its elected officials.

## III.  THE REQUESTED INJUNCTIVE RELIEF WILL NOT SUBSTANTIALLY HARM OTHER INTERESTED PARTIES

Any possible harm to DC 1 is negligible because the trusteeship was illegitimate in the first place.  More importantly, dissolution of the trusteeship will not harm but rather will benefit the parties with the greatest interest – the PPOA membership. Where, as here, a trusteeship is imposed without authority, the membership is "disenfranchised and deprived of the local autonomy to which it would ordinarily be entitled." *Smith v. Distillery, Rectifying, Wine & Allied Workers*, 75 LRRM (BNA) 2049, 1970 WL 638, *4 (E.D.Ky. 1970) (holding that local union was irreparably injured by a trusteeship imposed without constitutional authority).

When the illegitimate trusteeship is dissolved, the PPOA will be able to return to normal operations under the leadership of its own officers.

## IV.  PUBLIC POLICY FAVORS INJUNCTIVE RELIEF FOR DEFENDANTS/COUNTERCLAIMANTS

Public policy favors dissolution of this purported trusteeship primarily because it was illegitimate from its inception and was imposed without authority, without proper procedures and for improper purposes, all in violation of the LMRDA.  *Brown*, 343 F.2d at 882 (union does not have

authority to impose trusteeship where its constitution and bylaws do not provide for such authority); *Laborers'*, 880 F.2d at 1396 (trusteeships imposed without a fair hearing may be invalidated).

In addition, the trusteeship and removal of democratically elected officers flies in the face of one of the fundamental purposes of the LMRDA, "to preserve and protect, among other things, a local union's fundamental right of self-determination." *Local 450, IUE*, 30 F.Supp.2d at 586.

Public policy strongly supports dissolution of a trusteeship imposed in violation of the plain language and intent of the LMRDA.

## V.    CONCLUSION

For all the reasons stated herein, the Counterclaimants respectfully request the Court grant their Motion for Preliminary Injunction.

Dated:  June 16, 2008          Respectfully submitted,


                               s/ Arlus J. Stephens
                               Arlus J. Stephens (478938)
                               Keira M. McNett (482199)
                               Davis, Cowell & Bowe LLP
                               1701 K Street NW, Suite 210
                               Washington, DC 20006
                               (202) 223-2620
                               (Fax) (202) 223-8651

                               Attorneys for Defendants/Counterclaimants

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FRATERNAL ORDER OF
POLICE, DC LODGE #1, et al.

       Plaintiffs,

vs.

EDWARD BARRY, et al,

       Defendants.

Civil No. 08-462 (ESH)

## [PROPOSED] ORDER

For good cause shown, the Court hereby grants the

Defendants/Counterclaimants' Motion for a Preliminary Injunction and

orders, until further notice, that Plaintiffs/Counterdefendants: a)

terminate the trusteeship of the PPOA; b) cease and desist any further

attempts to trustee the PPOA; c) relinquish all claims of authority over

the operations of the PPOA; d) reinstate the officers of the PPOA who

were removed pursuant to the purported trusteeship; e) relinquish all

claims to the property and assets of the PPOA, including its records and

its accounts and email list serv; and f) pay any costs the PPOA incurs in

properly notifying its members of this decision.

_____    _____

DATE                           UNITED STATES DISTRICT JUDGE

# BRIEF ATTACHMENT A

## (2002 NMB Decision)

Westlaw.

29 NMB 265, 29 NMB No. 46, 2002 WL 533476 (N.M.B.)                    Page 1

29 NMB 265, 29 NMB No. 46, 2002 WL 533476 (N.M.B.)

National Mediation Board (NMB)

**1 RE: CONSOLIDATED RAIL CORPORATION/FOP, NLC-CONRAIL 1/UTU

File No. C-6745/Case No. R-5892

April 10, 2002

*265 Mr. L. J. Finnegan
Assist. VP-Labor Relations

Jeffrey S. Berlin, Esq.

Ronald M. Johnson, Esq.

Clinton J. Miller, Esq.

Mr. C.A. Iannone, Vice Pres.

Mr. A.D. Compitello, Pres.

Mr. Mark Wilson, President

Gentlemen:

This determination addresses the January 24, 2002, UnitedTransportation**266 Union
(UTU) request to transfer the Fraternal Order of Police, National Labor Council-
Conrail 1 (FOP, NLC-Conrail 1) certification in NMB Case R-5892, covering the Po-
lice Officers below the Rank of Captain craft or class, employees of Consolidated
Rail Corporation (Conrail) to the UTU. For the reasons discussed below, the Na-
tional Mediation Board (Board) finds the organization certified in NMB Case R-5892
was inadvertently identified as the Fraternal Order of Police (FOP), and the cor-
rect title of the organization is the Fraternal Order of Police, National Labor
Council (FOP, NLC). Furthermore, the facts establish that the FOP, NLC no longer
exists and the independent organization FOP, NLC-Conrail 1 retains NMB Case R-5892
certification. Therefore, the Board grants the UTU's request and transfers the
FOP, NLC-Conrail 1 certification to the UTU.

I.

REQUEST FOR TRANSFER OF CERTIFICATION

The FOP was certified to represent the Police Officers below the Rank of Captain

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

craft or class, employees of Conrail in NMB Case R-5862. *Consolidated Rail Corp.*, 16 NMB 377 (1989) (*Conrail*).

The UTU request, signed by Bryon A. Boyd, International President, UTU, states, in pertinent part:

> [O]fficers from both the United Transportation Union ("UTU") and FOP met to discuss a merger. In December 2001, the FOP submitted to its members by mail, and in accordance with its constitution . . . a resolution asking if the members wished to merge with UTU and have UTU represent them.
> On January 7, 2002, the members of FOP, voted by a margin of 48 - 5, to merge with UTU and have UTU represent them.

The request includes the following supporting documents:

> *267 • The Collective Bargaining Agreement between Conrail and the FOP, NLC-Conrail 1;
> **2 • The FOP, NLC-Conrail 1 Constitution; and
> • A January 7, 2002, letter from Gregg Bernstein, CPA, Gregg Bernstein & Associates, P.C., to Mr. Alfred Compitello, President, FOP, NLC-Conrail 1, certifying the results of the merger ballot: 48 votes "in favor of the proposed merger with UTU," and 5 votes "against the proposed merger with UTU."

II.

## CONRAIL'S CONTENTIONS

Conrail contends that the UTU's request for transfer of certification is "invalid" for the following reasons:

The Fraternal Order of Police (FOP), a national labor organization with thousand of members, is the certified collective bargaining representative of the Police Officers below the Rank of Captain craft or class at Conrail. The FOP has not voted to merge with UTU. Only a local of the FOP, the FOP, NLC-Conrail 1, has voted to merge the UTU.

Conrail has entered into significant collective bargaining agreements covering the craft or class with the FOP and on February 16, 1990, Conrail entered into an agreement establishing Public Law Board 4877 to consider grievances with FOP. Any Conrail collective bargaining agreements with the organization, FOP, NLC-Conrail 1, are of "no consequence" with regard to the claimed merger with UTU. Because UTU's request for transfer of the certification is based on a vote by the FOP, NLC-Conrail 1, a local organization and not the FOP, the exclusive representative, the request must be denied.

The UTU's request is premature because the UTU has not claimed that the merger has occurred and has not furnished the*268 Board with "a copy of a formal Conrail 1/UTU merger agreement." In addition, for a merger to occur "[t]he Constitution of Conrail 1 would have to be amended . . . in Article XX . . . *only at the local*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 NMB 265, 29 NMB No. 46, 2002 WL 533476 (N.M.B.)                                        Page 3

*union's annual meeting . . .* 'during the month of July or August."' Since neither of these events has occurred, the "UTU is plainly jumping the gun," and the request should be denied.

### III.

#### UTU's CONTENTIONS

The UTU contends the request for transfer of certification should be granted for the following reasons:

Conrail does not have standing to raise any questions concerning the merger between the UTU and the FOP, NLC-Conrail 1. Only FOP, NLC-Conrail 1 members have standing to raise such issues.

The FOP, NLC was created to be the collective bargaining representative of Conrail police officers and the United States Postal Service Police (USPSP). The FOP, NLC-Conrail 1 has a licensing agreement with the FOP to use the FOP trademark. There is no other relationship between the FOP and the FOP, NLC-Conrail 1, which is otherwise an independent labor organization. In NMB Case R-5892, the representation application was made in the name of the FOP, NLC and the ballots bore the name FOP, NLC. The Board's 1989 certification of FOP was merely "a short-hand version of . . . the full title [FOP, NLC]."

Furthermore, Conrail "has no authority to interpret or apply a union's constitution or deal with internal union matters." Negotiations on the UTU/FOP, NLC-Conrail 1 merger began in October 2001 and by December 20, 2001, the FOP, NLC-Conrail 1 Executive Board submitted the merger agreement to the Organization's 58 members for a vote. The merger was approved by a vote of 48 in favor and 5 opposed. The merger between the two organizations was consummated and the UTU's request for**269** transfer of certification should be approved.

**\*270** IV.

#### FOP AND FOP, NLC CONTENTIONS

**\*\*3** The FOP and the FOP, NLC did not make submissions.

### V.

#### STATEMENT OF FACTS

#### A.

#### NMB Case R-5892

The application for representation in NMB Case R-5892 identifies the organization seeking authorization to represent the Police Officers below the Rank of Captain

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 NMB 265, 29 NMB No. 46, 2002 WL 533476 (N.M.B.)                                    Page 4

craft of class at Conrail as: "Fraternal Order of Police, National Labor Council."

The ballot displays the names of the two competing organizations in the representation election as: "International Brotherhood of Teamsters-Railroad Police Officers" and "Fraternal Order of Police, National Labor Council."

The Board's Report of Election Results identifies the names of the two organizations as: "International Brotherhood of Teamsters" and "Fraternal Order of Police." Finally, the certification identifies the "Fraternal Order of Police" as the duly designated and authorized representative of the craft or class of Police Officers below the Rank of Captain at Conrail. *Conrail, above.*

On October 19, 1989, Robert Flake, President, FOP, NLC wrote to Charles R. Barnes, Executive Director, National Mediation Board, requesting that the certification be corrected,

> to indicate that the NLC and not the Fraternal Order of Police is the certified collective bargaining representative of the craft or class of Police Officers below the Rank of Captain, employees of*271 Consolidated Rail Corporation. . .
> .

> The NLC -- a labor organization headquartered in Joliet, IL is independent from the Fraternal Order of Police and there has not been any question that it was the NLC which was seeking to represent this craft or class of employees.

B.

## The Fraternal Order of Police, National Labor Council

During the Board's investigation many witnesses were interviewed concerning the FOP; the FOP, NLC and the FOP, NLC-Conrail 1.

Allen S. Kinzer, Esq., provided legal counsel to the FOP on labor matters at the time the FOP, NLC was created. Kinzer stated that the FOP saw a need for labor organizations to represent multi-jurisdictional and national police organizations. Kinzer stated, since the FOP's structure did not fit that purpose, the FOP, NLC was created. The FOP, NLC was incorporated in the District of Columbia to represent employees under the jurisdiction of the National Mediation Board (Board), the National Labor Relations Board (NLRB), and the Federal Labor Relations Authority (FLRA). The FOP, NLC-Conrail 1 was the first local of the FOP, NLC. Some time in 1992 or 1993, the USPSP was added and represented by the local labor organization the FOP, NLC-USPS 2. In the mid-1990's, FOP's interest in the FOP, NLC waned. The FOP, NLC had no board meetings and no president for some time. Kinzer's representation of the FOP ended in the late 1990's, but he understood that the FOP, NLC had been dissolved by the FOP, recently.

Mark Wilson, President, FOP, NLC-USPS 2, stated that the FOP, NLC-USPS 2 was certified by the NLRB to represent postal police officers around 1990. He explained that the FOP, NLC was created to bring collective bargaining rights to federal po-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lice officers. He said the plan never worked and there have been no FOP, NLC meetings since 1994. Wilson stated that this past year,**272** the FOP decided there was no reason for the FOP, NLC to exist. Therefore, the FOP, NLC-USPS 2 affiliated with the labor committee of the FOP, DC Lodge 1. Wilson stated that the FOP, NLC-USPS 2 has maintained its name to keep the goodwill and corporate identity of the FOP trademark.

**\*\*4** Stephen G. DeNegis, Esq., counsel to many FOP locals, stated that in 1996 "[t]he United States Treasury Police Association, Texas Lodge 50, Fraternal Order of Police, National Labor Council Local 3" (FOP, NLC-BEP 3) was certified by the FLRA to represent the police bargaining unit at the Bureau of Engraving and Printing, Western Currency Reserve, Fort Worth, Texas (BEP). *Department of Treasury, Bureau of Engraving and Printing, Western Currency Reserve, Fort Worth, Texas and United States Treasury Police Association, Texas Lodge 50, Fraternal Order of Police, National Labor Council Local 3*, Case DA-RP-60046, September 6, 1996. DeNegris said that he filed to amend the FOP, NLC-BEP 3 certification because the FOP, NLC no longer met legal requirements of a labor organization under 5 USC § 7101, *et seq*. He stated that the FOP, NLC-BEP 3 needed to be structured independently of the FOP, NLC. The FLRA amendment of recognition and certification was issued to the newly named organization "The United States Treasury Police Association, Fraternal Order of Police, Texas Lodge 50" (FOP, Lodge 50). *Department of Treasury, Bureau of Engraving and Printing, Western Currency Reserve, Fort Worth, Texas and United States Treasury Police Association, Fraternal Order of Police, Texas Lodge 50*, Case DA-RP-60046, October 26, 2000. FOP, Lodge 50 is an independent labor organization using the FOP trademark, DeNegris said.

Tim Mullaney, Chairman, FOP National Labor Services Committee, stated that the FOP National Board dissolved the FOP, NLC in August 2001. Mullaney says even when the FOP, NLC was in existence, all three units, Conrail 1, USPS 2, and BEP 3 operated separately and independently under a lease agreement to use the FOP trademark.

The DC Corporation Office records establish that the FOP, NLC, Inc. was created on August 24, 1989, as a not-for-profit**273** corporation (Registration ID #893156). Ms. Edelin, DC Corporation Office, stated that the FOP, NLC, Inc.'s last annual report was filed in 1995 and the corporation was revoked by the DC government on September 8, 1998.

VI.

<u>DISCUSSION</u>

The Railway Labor Act (RLA) requires only that the Board investigate a transfer of certification based on a union merger rather than mandating any procedures for such an investigation. *Consolidated Rail Corp.*, 28 NMB 30 (2000) (citing *Continental Airlines, Inc., v. National Mediation Board*, 793 F. Supp. 330 (D.D.C. 1991), *aff'd mem.*, 957 F.2d 911 (D.C. Cir. 1992), *cert. denied*, 493 U.S. 974 (1992)). The

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 NMB 265, 29 NMB No. 46, 2002 WL 533476 (N.M.B.)                                    Page 6

Board views an organization's decision to merge into another organization as an
internal union matter and the Board will grant requests for transfers of certific-
ation based on union mergers unless there is evidence of fraud or gross abuse in
the merger or election.  *Northwest Airlines, Inc.,* 18 NMB 446 (1991).

The Board generally grants a transfer request based upon assertions contained in
the request letters. *Big Sky Trans. Co.,* 25 NMB 376 (1998); *Desert Sun Airlines*,
24 NMB 137 (1997); *Northwest Airlines,* above at 448; *Transtar Airlines*, 14 NMB 377
(1987); *Brotherhood of Ry., Airline & S.S. Clerks*, 13 NMB 408 (1986); *Railroad
Yardmasters of Am.*, 13 NMB 6 (1985).

**5 Based on the investigation, the Board finds that the organization name
"Fraternal Order of Police" in NMB Case R-5892 certification was used inadvert-
ently and the correct name of the certified organization is the FOP, NLC. The in-
vestigation also establishes, since the certification, the FOP, NLC has represen-
ted Police Officers below the Rank of Captain at Conrail as the FOP, NLC-Conrail
1.

Created in 1989 by the FOP, the FOP, NLC was to be an independent, umbrella coun-
cil of local labor organizations representing police officers with multi-
jurisdiction and national*274  police powers using the FOP trademark. Also in
1989, the FOP, NLC became a not-for-profit DC corporation. The first local labor
organization created under the FOP, NLC was Conrail 1, under a Board certifica-
tion. Later, the local USPS 2 was added to the FOP, NLC under an NLRB certifica-
tion. In 1996, the local BEP 3 was added to the FOP, NLC under an FLRA certifica-
tion.

By the mid-90's, the FOP, NLC was nothing more than a shell. As a corporation, the
FOP, NLC, Inc. was revoked by the DC Government in 1998. The FOP dissolved the
FOP, NLC in August 2001. The three locals formed under the FOP, NLC became inde-
pendent labor organizations which merely use the FOP trademark. As independent
labor organizations, USPS 2 affiliated with FOP, DC Lodge 1; BEP 3 affiliated with
FOP, Texas Lodge 50; and Conrail 1 has voted to merge with the UTU.

                                    VII.

                                 CONCLUSION

The submissions of UTU and the FOP, NLC-Conrail 1 establish that the two organiza-
tions have merged. There is no evidence of fraud or gross abuse in the merger or
election. Since the FOP, NLC-Conrail 1 has merged into UTU, the request for trans-
fer of certification is granted. The Board's records are revised to reflect the
transfer of the certification issued to FOP, NLC-Conrail 1 in NMB Case R-5862 to
UTU.

By direction of the NATIONAL MEDIATION BOARD.

                © 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

29 NMB 265, 29 NMB No. 46, 2002 WL 533476 (N.M.B.)                           Page 7


Benetta Mansfield

Chief of Staff

 29 NMB 265, 29 NMB No. 46, 2002 WL 533476 (N.M.B.)
END OF DOCUMENT

                © 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# BRIEF ATTACHMENT B

## (Excerpt from Malin Treatise)

# Individual Rights Within the Union

## Martin H. Malin
*IIT Chicago-Kent College of Law*

with

## Lorraine A. Schmall
*Wake Forest University School of Law*
(Chapters 8 and 9)



The Bureau of National Affairs, Inc., Washington, D.C.

## Validity of the Trusteeship

Section 302 expressly requires that a trusteeship be established and administered in accordance with the constitution and bylaws of the parent union and be for one of four enumerated purposes. Additionally, courts have implied from Section 304(c) a requirement that the trusteeship be authorized or ratified after a fair hearing. The following subsections explore these requirements in detail.

### "In Accordance with the Constitution"

A threshold issue concerning the validity of a trusteeship is whether it can be imposed at all if the union's constitution and bylaws do not specifically authorize it. The Labor Department initially took the position that Title III does not require a union to expressly authorize trusteeships in its constitution but only requires a union to follow whatever procedures exist in the constitution.[19] Courts have rejected that view and held that a trusteeship may not be imposed if it is not expressly authorized in the union's constitution.[20] Judicial authority, however, is split over whether the constitution need only authorize the trusteeship or must go further and specify the purposes for which a trusteeship may be imposed and the procedures that must be followed.[21]

The better view is that the constitution must specify the purposes and procedures for authorized trusteeships. This is in keeping with the plain language of the statute which mandates that the trusteeship be established *"only* in accordance with the constitution and bylaws."[22] If the constitution fails to specify the purposes and procedures, it is impossible to establish the trusteeship in accordance with the constitution.

Moreover, requiring that the constitution specify purposes and procedures is consistent with the congressional intent to "encourage the use of fair procedure within the union."[23] A contrary interpretation would require unions adopting such provisions in their constitu-

---

[19] U.S. Dep't of Labor, Union Trusteeships: A Report to the Congress 35–36 (1962).

[20] *See, e.g.,* Carpenters v. Brown, 343 F.2d 872, 59 LRRM 2140 (10th Cir. 1965); Flight Engineers v. Continental Air Lines, 297 F.2d 397, 49 LRRM 2951 (9th Cir. 1961), *cert. denied,* 369 U.S. 871, 50 LRRM 2170 (1962); Smith v. Distillery Workers, 75 LRRM 2049 (E.D. Ky. 1970); Telephone Workers, Local 2 v. Telephone Workers, 261 F. Supp. 433, 64 LRRM 2029 (D. Mass. 1966).

[21] *Compare* Carpenters v. Brown, 343 F.2d 872, 59 LRRM 2140 (10th Cir. 1965); Smith v. Distillery Workers, 75 LRRM 2049 (E.D. Ky. 1970); and Telephone Workers, Local 2 v. Telephone Workers, 261 F. Supp. 433, 64 LRRM 2029 (D. Mass. 1966) *with* Leather Goods Workers, Local 167 v. Leather Goods Workers, 316 F. Supp. 500, 75 LRRM 2056 (D. Del. 1970); and Electrical Workers, IBEW, Local 1186 v. Eli, 307 F. Supp. 495, 72 LRRM 2814 (D. Hawaii 1969). Of course where the constitution contains such specifications, the fact that it labels the procedure something other than a trusteeship should not invalidate the trusteeship. *See* Sawyers v. Machinists, 279 F. Supp. 747, 753, 67 LRRM 2375, 2379–80 (E.D. Mo. 1967).

[22] 29 U.S.C. §462 (emphasis added).

[23] S. Rep. No. 187, 86th Cong., 1st Sess. 18 (1959); H. Rep. No. 741, 86th Cong., 1st Sess. 14 (1959).

tions to be bound by them while allowing unions whose constitutions merely provided vague authority for imposing trusteeships greater freedom in exercising that authority. The message to unions would be clear: Avoid the fairness and regularity that results from having specific standards in your constitution.

In determining whether a union has complied with its constitution, courts should be mindful of avoiding "a substitution of judicial for union authority to interpret the union's regulations."[24] Thus, courts accept the union's interpretation of its constitution and bylaws unless that interpretation is unreasonable.[25] Courts have avoided overly technical applications of the union's constitution that would invalidate otherwise valid trusteeships. For example, in *Jolly v. Gorman*[26] the international union imposed a trusteeship on a local union because the local was striking in violation of a no-strike clause contained in one of its collective bargaining agreements. The international's constitution required, inter alia, that charges be communicated to the local in writing by registered mail. The Fifth Circuit held that this requirement was satisfied by a letter sent by ordinary mail and a telegram, as each directed the local to end the strike and comply with the collective bargaining agreement and thus gave the local fair warning of charges made against it and of the international's concern with the local's activities.

The international's constitution in *Jolly* also required that the trusteeship be imposed only upon approval of the international's executive board. The board did not adopt a formal resolution approving the trusteeship. It did direct the international's officers to end the strike. The court, after examining the record of the executive board's meeting, observed that it was beyond doubt that the trusteeship was imposed with the approval of the board and concluded that the constitution had been complied with.

In contrast to the situation in *Jolly* are cases where courts found that no reasonable interpretation of the union's constitution would sanction the trusteeship. In such instances the courts have struck down the trusteeship as violative of Title III.[27]

## Proper Purpose

Trusteeships are only valid where they are imposed to: correct corruption or financial malpractice, assure performance of a collective bargaining agreement or other duties of a bargaining representa-

---

[24] Boilermakers v. Hardeman, 401 U.S. 233, 242–43, 76 LRRM 2542, 2545 (1971).

[25] *See, e.g.*, Vestal v. Hoffa, 451 F.2d 706, 78 LRRM 2996 (6th Cir. 1971), *rev'g*, 329 F. Supp. 801, 77 LRRM 2855 (M.D. Tenn. 1971), *cert. denied*, 406 U.S. 934, 80 LRRM 2294 (1972).

[26] 428 F.2d 960, 74 LRRM 2706 (5th Cir. 1970), *cert. denied*, 400 U.S. 1023 (1971).

[27] *See, e.g.*, Higgins v. Harden, 644 F.2d 1348, 107 LRRM 2438 (9th Cir. 1981); Carpenters v. Dale, 118 LRRM 3160, 3164 (C.D. Cal. 1985), *aff'd in part, rev'd in part mem.*, 122 LRRM 2368 (9th Cir. 1986); Burch v. Machinists, 337 F. Supp. 308, 78 LRRM 2444 (S.D. Fla.), *aff'd*, 454 F.2d 1170, 78 LRRM 3072 (5th Cir. 1971).

In *Hall v. Cole*,[135] the Supreme Court approved the award of attorney fees to a successful Title I plaintiff under the common benefit rationale. The Court emphasized the role of Title I in safeguarding union democracy and reasoned that the discipline of a member for exercising rights guaranteed by Title I chills the rights of all other members of the union. The Court concluded that the successful plaintiff confers a common benefit on the union membership by dispelling the chill cast upon members' rights.

A Title I action is usually directed against a local or intermediate body. A Title III action, on the other hand, is brought by or on behalf of the local or intermediate body against the international. A direct benefit, the lifting of the trusteeship, is bestowed upon the local. In *McDonald v. Oliver*[136] the Fifth Circuit asserted without any analysis, that the common benefit theory does not justify an award of attorney fees against an international. In *Higgins v. Harden*[137] the Ninth Circuit held that the common benefit theory justifies an attorney fees award against the international, citing *McDonald* and the common benefit conferred on the intermediate body by the lifting of the trusteeship. District Courts have cited Title I common benefit cases to justify awards of attorney fees.[138] Clearly the issue deserves more careful attention.

In enacting Title III, Congress was clearly concernd with the effect of the improper use of trusteeships on local autonomy. It was also concerned that trusteeships and the threat of imposing trusteeships were used to suppress dissent and entrench corrupt, autocratic rule within parent unions. The successful Title III plaintiff thus vindicates the rights of all members of the international in much the same way as a successful Title I plaintiff vindicates the rights of all members of a local or intermediate body. The common benefit rationale should therefore be available to justify an attorney fees award under Title III.

The bad faith rationale may also justify a Title III attorney fee award. The courts in *McDonald* and *Higgins* found bad faith in the improper purposes and administration of the trusteeships. Similarly, deliberate procedural error in establishing the trusteeship should also be regarded as establishing the requisite bad faith.

---

[135] 412 U.S. 1, 83 LRRM 2177 (1973); *see generally* Chapter 3 at notes 563–71 and accompanying text.

[136] 525 F.2d 1217, 1228, 91 LRRM 2215, 2222–23 (5th Cir.), *cert. denied*, 429 U.S. 817, 93 LRRM 2361 (1976).

[137] 644 F.2d 1348, 1352, 107 LRRM 2438, 2441 (9th Cir. 1981).

[138] Carpenters v. Dale, 118 LRRM 3160 (C.D. Cal. 1985), *aff'd in part, rev'd in part mem.*, 122 LRRM 2368 (9th Cir. 1986); Burch v. Machinists, 337 F. Supp. 308, 314, 78 LRRM 2444, 2449 (S.D. Fla.), *aff'd*, 454 F.2d 1170, 78 LRRM 3072 (5th Cir. 1971); *but see* Shimman v. Operating Engineers, Local 18, 744 F.2d 1226, 117 LRRM 2579 (6th Cir. 1984) (*en banc*), *cert. denied*, 469 U.S. 1215, 118 LRRM 2576 (1985) (Title I case rejecting findings of common benefit and limiting bad faith basis for attorney fee awards to bad faith conduct in the litigation).