IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRATERNAL ORDER OF POLICE, DC LODGE #1, et al. <br><br> Plaintiffs, <br><br> vs. <br><br> EDWARD BARRY, et al, <br><br> Defendants. | Civil No. 08-462 (ESH) |

**DEFENDANTS-COUNTERCLAIMANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISREGARD EXHIBIT D TO PLAINTIFFS' CROSS-MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs have now supplied an affidavit meant to authenticate their Exhibit D but questions remain about its validity. Moreover, the new affidavit confirms that the "standing rule" is not legally relevant and should be excluded.

**I.      The Authenticating Affidavit Leaves Many Questions Unanswered.**

In its Opposition, DC 1 has responded to one part of Defendants-Counterclaimants objections to Exhibit D by providing an affidavit that purports to authenticate the exhibit. However, this affidavit fails to answer questions central to establishing the exhibit's credibility: 1) when was the original rule adopted (beyond just "sometime late in 2000")?; 2) pursuant to what authority and procedures was the rule adopted and then subsequently amended after the

alleged trusteeship was imposed on the PPOA?; 3) where is it published?; 4) how are labor committees and their membership made aware of this rule?; and 5) is it part of a larger body of "standing rules," and if so where are these rules published?

Thus, although it has now been nominally authenticated, the credibility of Exhibit D is still questionable and as such the document should be disregarded. *Cf. Qualls v. Rumsfeld*, 357 F.Supp.2d 274, 281 (D.D.C. 2005).

## II. The Affidavit Confirms that Exhibit D is Not Legally Relevant.

The so-called "standing rule on trusteeship" should be disregarded for the additional reason that it is not legally relevant evidence. Fed R. Evid. 402; *Mazhoum v. Dist. of Columbia MPD*, 530 F.Supp.2d 282, 295 (D.D.C.2008) (evidence that is not probative under the governing legal standard should be excluded). The so-called standing rule is not relevant because it cannot provide legal authority for a trusteeship here for at least four separate legal reasons:

1)  LMRDA Section 302 provides that a trusteeship may be established and administered "only in accordance with the constitution and bylaws of the organization which has assumed trusteeship," not in accordance with some other document like "standing rules." 29 U.S.C. §462 (emphasis added).

2)  A union's constitution or bylaws must provide an explicit right to trustee a subordinate union; such an important power cannot be inferred from

2

vague or general statements of authority. *United Bhd. of Carpenters v. Brown*, 343 F.2d 872, 881-82 (10th Cir. 1965); *Flight Engineers Int'l Assoc. v. Continental Airlines*, 297 F.2d 397, 402 (9th Cir. 1961). The DC 1 constitution and bylaws provide no such right to trustee a labor committee such as the PPOA.

      3)    Trusteeship is a matter of contract. *Int'l Bhd. of Boilermakers v. Local Lodge 714*, 845 F.2d 687, 691 (7th Cir. 1988), *cited with approval in Laborers' Int'l Union v. National Post Office Mail Handlers*, 880 F.2d 1388, 1395 (D.C. Cir. 1989). The Charter Agreement is the contract between DC 1 and the PPOA, and it incorporates also the DC 1 Constitution. Neither document provides DC 1 with any authority to trustee a labor committee or to come up with DC 1 standing rules that will be a source of substantive rights. Indeed, although Mr. Cannon testifies (Pl. Opp., Ex. A) that the "standing rule" was adopted in 2000 -- a year before the PPOA and DC 1 entered into the Charter Agreement – it is telling that neither the Constitution nor the Charter mention it.

      Both parties to the Charter Agreement have a remedy if they are not satisfied with their contractual relationship: they can terminate the Charter Agreement (Wilson Declaration, ¶7 (Doc. 30)). In fact, DC 1's nominal trustee, Plaintiff Anthony, himself recently confirmed in an email that dissolving the Charter is an available option (Vitolo Supp. Decl, Exhibit 1, at page 2).

4)    Under the Charter Agreement, the PPOA is subject to DC 1's Constitution which contains, at Article 30, a specific provision on amendments. The very purpose of an amendment process is to change the substantive rights and responsibilities set forth in a constitution or bylaws. Yet DC 1 has never availed itself of the amendment process to incorporate a trusteeship right into either the constitution or the bylaws. As previously argued in our Brief in Opposition to DC 1's Cross Motion for Preliminary Injunction (Doc. 39, pages 6-7), DC 1 should not be permitted to bypass the amendment process and bootstrap the "rule on trusteeship" into its constitution and bylaws by relying on the Constitution's reference to Robert's Rules of Order, which in no way concerns union trusteeships under the LMRDA.

## Conclusion

The Court should disregard Exhibit D as unreliable and irrelevant.

Dated: July 14, 2008                Respectfully submitted,

s/ Keira M. McNett
Arlus J. Stephens (478938)
Keira M. McNett (482199)
Davis, Cowell & Bowe LLP
1701 K Street NW, Suite 210
Washington, DC 20006
(202) 223-2620
(Fax) (202) 223-8651

Counsel for Defendants-Counterclaimants

4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FRATERNAL ORDER OF POLICE,
DC LODGE #1, et al.

    Plaintiffs,

vs.

EDWARD BARRY, et al,

    Defendants.

Civil No. 08-462 (ESH)

**SUPPLEMENTAL DECLARATION OF CHRISTOPHER VITOLO**

I, Christopher Vitolo, hereby declare and state that I have personal knowledge of these facts and if called as a witness could and would competently testify as follows:

1. Attached as Exhibit 1 is a printout of an email that was posted on a PPOA listserv on or about July 8, 2008. The email reflects a conversation between DC 1 representative Steve Anthony and a postal police officer.

I declare under the penalty of perjury that the foregoing facts are true and correct to the best of my knowledge.

_____
Date: 14 July 08

_____
Christopher Vitolo

--- On **Tue, 7/8/08, kumodc** <*no_reply@yahoogroups.com*> wrote:

> From: kumodc <no_reply@yahoogroups.com>
> Subject: [fopnlc2 members] FYI
> To: fopnlc2members@yahoogroups.com
> Date: Tuesday, July 8, 2008, 2:28 PM

I wrote him and he answer. Who woould have thonk it...

PPO Kenny
I am responding to your May 9 message. Sorry it took so long to reply. Let me explain.

First, as you may have heard Barry, Ferrarro and the others filed a counter lawsuit against DC1 so now the litigation is hot and heavy and it has been consuming most of my time after the arbitration ended. It has also been consuming most of NLC2's treasury I am very sad to say. The legal fees are well over $100,000 combined and for what? The purpose of the trusteeship was simply to end the EB bickering, reinstate due process of law and to investigate the financial problems that were reported by the union's independent CPA. That is right --- the union's CPA not Terry Grant. If the union's auditor is concerned about what is going on with the books then so too should the members. That and violations of due process of law is why DC1 stepped in.

Also, as a result of the litigation, the bank froze the union bank accounts so now I have no money to run the union. We cannot even pay our National Business Reps to handle members cases. This is a mess and for no reason. Barry, Ferrarro et al could have turned the bank accounts over to DC1 so we could continue the union's business and still pursued their case in court. If the court ruled against DC1 then we would step out. If the court ruled for DC1 then at least we could have been representing the members all along until elections are held this summer.

So, the union has not been able to pay Attorney Kaplan or the arbitrator for their work either. This is a disgrace!!!

To answer your May 9 questions about the contract I needed some input from Attorney Kaplan but since he hasn't been paid I couldn't call on him. So, that was part of the reason I didn't get back to you. Now it looks like things will go on for another few months so let me try to answer your questions as best that I can.

Visit Your Group

**Special K Group**
on Yahoo! Groups
Learn how others
are losing pounds.

**Dog Zone**
on Yahoo! Groups
Join a Group
all about dogs.

**Y! Groups blog**
The place to go
to stay informed
on Groups news!



The arbitrator cannot give us carrying power, LE retirement, or locality pay because there is no law in place for him to rely on and management will not give it to PPO's voluntarily. It is not the budget, it is the law. And we need to fix it. That is why we included these items in the arbitration, not because we expected to get them awarded, but because we wanted the arbitrator to report that there is no law to help the PPO's in this matter. The strategy here is to use the arbitrator's official report to go to congress and prove once and for all that new legislation is needed and that the PPO's have exhausted all their administrative remedies. This is the first step to get congress to look into the matter. Bjork and a lot of others don't understand how things work so they complain that this was a waste of time. But Bjork and the others are not attorneys and have no experience that I am aware of in trying to get new legislation from congress. This was Kaplan's advice on how to proceed to get the law changed and the FOP lobbyist agrees. I don't know anyone who has a better plan to get the law changed for PPO's but if there is anyone I would certainly welcome their comments.

The answer to your other questions about 1) the $300 bonus, 2) why there are two years w/o eci-1 as our raise and three with it, etc can only be answered by the arbitrator. He is the one that came up with this compensation arrangement after listening to management vs NLC2 for over a week. It is just the way it is and I agree that it all doesn't appear to be logical. That is the way compromises work. You stated that some contract guards in NJ make more than starting salary for PPO's but for the most part PPO's do not enter at the starting salary and generally most PPO's make more than the guards. But that is why I believe the long term strategy is to go to congress ---- assuming there is enough money left over after Barry and Ferrarro's battle over the Trusteeship.

In regard to the allegations, I have not started the investigations yet and will not start until after the litigation is resolved. Once the investigations are concluded and the Constitution and Bylaws are revised to provide due process of law protections to members, then DC1 will withdraw the trusteeship. DC1 did not establish the trusteeship to hurt NLC2-- we are trying to get NLC2 back on their feet and get rid of the corruption. However, if DC1 doesn't think the members are willing to save their union and start doing the right thing, they could conceivably decide to revoke the charter. I think PPO's need the power of FOP behind them to get the law changed in congress so I have asked DC1 to wait until the litigation is over and then we can see if the PPO's will start doing the things that need to be done to clean up the EB and elect new officers who want to do the right thing.

Once again please accept my apology for taking so long to reply. I hope I have answered your questions. If not, please feel free to contact me again.
Regards
Steven Anthony
Trustee

Messages in this topic (5)       Reply (via web post) | Start a new topic

7/14/2008

Messages | Links | Polls | Members | Calendar

**MARKETPLACE**

Attention, Yahoo! Groups users! Sign up now for a one-month free trial from Blockbuster. Limited time offer.

---

**YAHOO! GROUPS**

Change settings via the Web (Yahoo! ID required)
Change settings via email: Switch delivery to Daily Digest | Switch format to Traditional
Visit Your Group | Yahoo! Groups Terms of Use | Unsubscribe